THOMAS A. COLTHURST (CABN 99493)
First Assistant United States Attorney

KATHERINE L. WAWRZYNIAK (CABN 252751)
Chief, Criminal Division

MARJA-LIISA OVERBECK (CABN 261707)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6809
    FAX: (415) 436-7234
    mari.overbeck@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOSE GARCIA (aka "Bones"), <br><br> Defendant. | CASE NO. 21-CR-311 YGR <br><br> **UNITED STATES' SENTENCING MEMORANDUM** |

## I. INTRODUCTION

The government submits this memorandum in advance of the sentencing of defendant Jose Garcia (aka "Bones"). Garcia pled guilty to one count of Conspiracy to Commit Hobbs Act Robbery in violation of Title 18, United States Code, Section 1951(a) based on his agreement to conspire to obtain money or property from a residence in Union City, California. The parties have entered into a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), pursuant to which they have agreed that an appropriate sentence for Garcia's crime is 24 months of incarceration followed by three years of supervised release. *See* ECF No. 104 (Plea Agreement) ¶ 8. The government respectfully requests that the Court approve this agreement and impose a sentence of 24 months, as Probation also has recommended.

## II. FACTUAL BACKGROUND

### A. Procedural History

On August 12, 2021, a federal grand jury returned a three-count indictment charging six defendants, including Jose Garcia, with (1) Hobbs Act Conspiracy (Count One); (2) Conspiracy to Commit Murder in Aid of Racketeering (Count Two); and (3) Conspiracy to Commit Assault with a Deadly Weapon/Assault Resulting in Serious Physical Injury in Aid of Racketeering (Count Three). ECF No. 1. The indictment alleges the defendants' membership in a racketeering enterprise known as "El Hoyo Palmas" (EHP), an associated-in-fact group consisting of Norteño street gang members and associates.

On February 23, 2023, Garcia pled guilty to Count One as part of a global resolution of the charges set forth in the indictment. The government has agreed to dismiss Count Two (VICAR murder conspiracy) and Count Three (VICAR assault conspiracy) of the indictment as against Garcia at the time of sentencing. Plea Agreement ¶ 14.

### B. Offense Conduct & Other Relevant Conduct

#### 1. Background of El Hoyo Palmas[1]

EHP is subservient to the Nuestra Familia (NF) prison gang and, specifically, the Santa Clara

---

[1] The government will be dismissing the VICAR counts as part of the resolution it reached with the defendant in this case. This factual background therefore is included only (1) to provide context to the conspiracy count to which the defendant has pleaded guilty; (2) to augment the Court's consideration

County Regiment of the NF, operating in San Jose, California and the surrounding Santa Clara County area. EHP has been in existence in San Jose since the 1970s. EHP has its own logos, tags, hand gestures, and terminology to designate themselves in public settings, such as the letter "P" or the word "Palmas," the logo of the Pittsburgh Pirates professional baseball team, and Hawaiian style shirts with palm trees. Close affiliates of EHP include Vato Thirty-Third (VTT), which is a reference to San Antonio Avenue and 33rd Street in San Jose.[2]

The NF and EHP have common purposes, which include: committing crimes of violence to promote and enhance the reputation of the enterprise and to keep rivals gang members in fear of it; enriching leaders, members, and associates through trafficking of controlled substances and firearms and through the commission of robberies; and providing financial support to gang members who are charged with crimes or incarcerated.

EHP, like other Norteño street gangs, has multiple "generations." EHP is comprised of six generations.[3] Each generation consists of several years' worth of members and has its own higher- and lower-ranking members. Typically, one gains status within EHP based on the commission of violent acts on behalf of the gang (or the willingness to do so) or by making money through narcotics or other criminal ventures. The six generations of EHP loosely reflect seniority within the gang, with the first generation being the oldest and the sixth generation being the newest. Meetings are held regularly, at which members pay dues and receive information about gang-related activities. During the meetings, attendees were generally separated by their respective generation. Prospective members need to prove their worth to gain entrance into EHP. Gaining entrance is often referred to as "being blessed."

EHP members are required to follow rules as dictated by both EHP and the NF more broadly. For EHP members, these rules were centered around respect, contributing to the gang, and not

---

of the defendant's background, history, and characteristics; and (3) to provide background on the obstruction enhancement.

[2] Garcia's tattoos include "P" behind his left ear; a palm tree on his right arm; and "thirty-third" on the back of his neck.

[3] In approximately 2009-2010, the San Jose Police Department conducted a large takedown of the earlier generations of EHP, many of whom were/are incarcerated. Consequently, the generations that were the most active during the period relevant to this indictment were the fourth, fifth, and sixth generations.

U.S. SENTENCING MEMORANDUM RE GARCIA    2
21-CR-311 YGR

cooperating with law enforcement. A violation of the rules can be meet with "DP" or "discipline," which often involves being assaulted by other members. Other times a member can be "removed," which can include being killed.

### 2. Underlying FBI Investigation

The FBI utilized multiple wiretaps in the Operation Quiet Storm/Grim Dawn investigation (e.g., the related cases—*see* PSR p. 2) into the NF and EHP. Regarding EHP, those wiretaps included:

| TELEPHONE USER | TARGET TELEPHONE |
|---|---|
| Juan Dominguez | TT6 |
| Jose Garcia | TT8, TT10 |
| Juan Gonzalez | TT9 |

Much of the evidence supporting the indictment in this case came from these intercepted communications.

### 3. Union City Robbery Conspiracy

In early September 2018, several members of EHP, including Garcia, conspired to rob drug dealers at a residence in Union City. From intercepted communications, the FBI learned of the conspiracy, which they were able to interrupt prior to its commission.

The conspiracy began when Defendant Caleb Eller[4] notified Garcia of two marks (referred to in the intercepted calls as "licks") in an intercepted call on September 4, 2018. (TT8, Session 3058.) In that call, Eller informed Garcia that in one location the residents "push powder" (slang for cocaine) and said that he believed that by robbing the location, they would be able to "come up" with at least a "brick" (slang for kilogram) as well as money for another brick. (PSR ¶ 16.) Garcia asked, "What's the deal with them? We have to knock doors down? Is there an easy way in? Or wait for somebody?" Eller told him that the residents were two brothers who had already been robbed once before, and so he did not expect them to put up a fight, but that Garcia would have to "boot the door down and get it from them." (TT8, Session 3058.) Garcia responded, "Ok, ok, I don't give a fuck how it goes down." (TT8,

---

[4] To date, Eller has not been located or arrested.

U.S. SENTENCING MEMORANDUM RE GARCIA    3
21-CR-311 YGR

Session 3058.)  Eller said he would give Garcia the address of the house, and later texted Garcia "Union City" and "Drives a black Mustang."  (TT8, Sessions 3089, 3091.)  Garcia then contacted Defendant Kyle Leonis via text message, writing: "I have a job for us" and "I'm a make sure after this you are blessed."  (PSR ¶ 17; TT8, Sessions 3068, 3070, 3072, 3074.)  Defendant Leonis later responded that he was "wit whatever boy."  (PSR ¶ 17; TT8, Sessions 3151, 3154, 3156, 3158, 3160.)  Eller and Garcia continued to talk about the robbery, with Eller noting that if the two brothers who lived at the robbery mark were "slapped up a bit," they would "give up" the drugs and money.  (PSR ¶ 16; TT8, Session 3103.)  On September 6, 2018, Garcia spoke with Eller and told Eller that Garcia planned to scope out the Union City house that night.  (PSR ¶ 18.)

In the days following, Garcia and others went to Union City to locate the robbery mark and conduct surveillance.  For example, on September 10, 2018, Garcia and Defendant Paul Valenzuela discussed going with Defendant Juan Gonzalez to Union City to take a "dry run" at the proposed robbery location.  (PSR ¶ 19; TT8, Sessions 4259, 4284, 4295.)[5]  On September 17, 2018, Garcia and Gonzalez discussed additional surveillance that Gonzalez had done of the Union City location, and Gonzalez notified Garcia that he had seen a couple with a baby at the address.  (TT9, Session 4830.)  Gonzalez told Garcia that he planned to go back to the address and "post up" (conduct additional surveillance), and both Garcia and Gonzalez discussed "needing this," because things had been "slow" lately.  (TT9, Session 4835.)

On September 19, 2018, Garcia told Gonzalez that Eller had confirmed that the marks were still selling drugs and that there likely was product at the house. They agreed that given that the children appeared to be school-aged, the best time for the robbery would be in the morning after the children were at school.  (PSR ¶ 20; TT9, Session 5337.)

### 4.   Suspected "Leak" & Obstruction Enhancement

On September 20, 2018, based on the intercepted calls summarized above, the FBI conducted a search warrant at the Union City residence.  On October 2, Eller informed Garcia that federal agents had gone to the house.  Garcia then called both Gonzalez and Defendant Juan Dominguez to tell them that

---

[5] Following these intercepted calls, FBI team members conducted physical surveillance on Garcia, Valenzuela, and Gonzalez meeting up at an In and Out in Union City.

U.S. SENTENCING MEMORANDUM RE GARCIA     4
21-CR-311 YGR

the planned robbery was off.  (TT10, Session 2764 (Garcia tells Dominguez: "The fucken alphabet boys got that address.  You know the one.").)  Garcia suspected that there was a "loose screw" (i.e., an informant) in their crew.  (TT10, Session 2764, 2794.)  By October 14, intercepted communications revealed that Garcia believed that he had identified Victim-1 as the suspected informant.  (TT10, Session 377  (Garcia says: "("I found the loose screw … it's in my own house").)  Subsequent intercepted communications suggested that Garcia assaulted Victim-1 on October 14, and that on October 15, Garcia told Dominguez that Garcia was told by "the homie" that Victim-1 needed to be "let go."  (PSR ¶ 22; TT6, Session 19315.)  That same day, Garcia told Leonis that Victim-1 was a "rat." (TT10, Session 516.)  On October 16, 2018, Victim-1 did not show up for work and cut off contact with Garcia, Dominguez, Gonzalez, Leonis, and Valenzuela.  (PSR ¶ 22.)  Over the next two days, Garcia made multiple intercepted calls to fellow gang associates showing that he was looking for the alleged informant.  (PSR ¶ 22; TT10, Session 810 (Call between Garcia and Leonis, where Garcia says that he had someone call Victim-1's workplace to see if Victim-1 was there, and was told that Victim-1 had not come to work, to which Garcia notes: "He's fucking scared for his life, fool.").)  On October 15, 2018, Garcia was intercepted talking to Taylor Johnston, a suspected associate of EHP and a suspected member of a gang known as the West Side Mob.  During the intercepted call, Johnston asked Garcia whether Victim-1 had come back, and Garcia said that he had not.  Johnston said that he could not believe that Victim-1 had not come back and asked Garcia what the neighborhood was saying, to which Garcia said, "it's on sight with him," "even if he comes back.""  "On sight" means that EHP members are authorized and expected to use force against the individual who has been targeted by the gang.

### III.     Garcia's Criminal History

Garcia has a 2006 juvenile felony conviction (assault with a deadly weapon) and a 2009 felony conviction for perjury.  The government agrees with Probation's calculations that Garcia's total criminal history score is three, which places him in a Level II Criminal History Category.  PSR ¶ 40.

### IV.     SENTENCING RECOMMENDATION

Consideration of all of the sentencing factors set forth in Title 18, United States Code, Section 3553(a) demonstrates that a 24-month sentence for Garcia is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a), paragraph (2).

Garcia's offense was dangerous and, but for the FBI's intervention, his actions would have posed great peril to those he planned to rob and to those in the surrounding community. He agreed to commit a home-invasion robbery with several others, expressing that he did not "give a fuck how it goes down." Garcia captured the robbery crew's motivation in his call with Gonzalez, noting that the crew "needed" to hit the mark to secure both a brick of cocaine and money that could be used to buy another brick because things had been "slow" lately, and because the crime would allow his fellow crew member (Leonis) to be "blessed"— motivations suggestive of larger criminal purposes. Garcia's own statements and actions demonstrate that he was eager to take part in the planned robbery: he avidly volunteered and recruited others to commit the robbery, and he indicated he was willing to use force as necessary. Once the robbery plot was thwarted, Garcia also threatened violence against the individual he suspected had informed the FBI of the plot, again showcasing his willingness to use violence, in this case to punish a suspected informant. The crime at issue is no doubt serious and deserving of the 24-month sentence proposed by the parties.

As noted, the government does not dispute Probation's determination that Garcia has a Criminal History Category of II (*see* PSR ¶ 40), and the parties agreed in the plea agreement to an offense level of 20, after acceptance of responsibility. That yields a guidelines calculation of 37 months to 46 months (*see* PSR ¶ 67). The parties, and Probation, agree that an appropriate disposition for Garcia is 24 months, which is a downward departure from the guidelines. The government submits that this downward variance is appropriate for three primary reasons: *First*, Garcia accepted responsibility in this case as part of a global resolution with his co-defendants, which resolution has facilitated a speedy resolution of the matter (and prior to cooperators being identified), and for which the government agrees that a downward variance therefore is appropriate. *Second*, this is Garcia's first federal conviction, and although the government believes his criminal history is under-representative of his criminal activities, it is nonetheless the case that he has only one adult conviction dating back to 2009. *Third*, although there is evidence that Garcia was, at the times relevant to the indictment in this case, a member of a violent and notorious criminal street gang, as noted in the PSR, Garcia experienced a challenging upbringing in that he grew up without his father and in an area of San Jose where gang violence was prevalent. Garcia may have been born into this lifestyle and felt that he had few other options. Considering all of these

factors, the parties' proposed 24-month sentence is a significant custodial sentence that is "sufficient but not greater that necessary" to satisfy the sentencing goals of Title 18, United States Code, Section 3553, and that will send a message to him and other members of EHP who are still operating on the streets that the potential consequences of this lifestyle are serious and will not go without just punishment.

## V.     CONCLUSION

For the reasons set forth above, the government requests that the parties' plea agreement pursuant to Rule 11(c)(1)(c) be accepted by the Court and that the defendant be sentenced to 24 months of imprisonment followed by three years of supervised release.

DATED: June 8, 2023

Respectfully submitted,

THOMAS A. COLTHURST
First Assistant United States Attorney

_____/s/_____
MARI OVERBECK
Assistant United States Attorney